# Table of Contents

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF THE INVESTIGATION ........................................................... 3

  A.  Background of the Investigation ......................................................................... 3

  B.  The Wire Investigation ....................................................................................... 5

III.    PROBABLE CAUSE .......................................................................................... 6

  A.  M. DRAYTON and K. DRAYTON ................................................................... 6

     1.  K. DRAYTON Supplies Drugs to M. DRAYTON Who Distributes to Drug Customer
       G.P. ......................................................................................................................... 6

     2.  K. DRAYTON and M. DRAYTON Coordinate an Upcoming Narcotics Supply and Discuss
       Money Owed from Drug Customer ...................................................................... 12

     3.  K. DRAYTON and M. DRAYTON Discuss Drug Supply Needs ....................... 15

  B.  MATTHEW DRAYTON and ARTHUR HODGES ........................................ 17

     1.  M. DRAYTON and HODGES Compare Drugs with Other Suppliers' Quality ............... 17

  C.  ARTHUR HODGES and PHILLIP WILLIAMS ............................................ 19

     1.  HODGES supplied P. WILLIAMS with Drugs for Distribution ........................ 19

  D.  MATTHEW DRAYTON, ARTHUR HODGES, and NELSIN HERNANDEZ ..................... 21

     1.  M. DRAYTON Supplies HODGES and N. HERNANDEZ with Drugs ............. 21

     2.  HERNANDEZ and HODGES Coordinate Drug Supplies ................................. 25

  E.  ARTHUR HODGES and TERRENCE DAYE ............................................... 26

     1.  T. DAYE Supplies HODGES with Drugs ......................................................... 26

     2.  T. DAYE Supplies HODGES's Stash Locations at Fidelis Way ....................... 29

  F.  ARTHUR HODGES, TERRENCE DAYE, NELSIN HERNANDEZ, and PHILLIP
     WILLIAMS .......................................................................................................... 30

     1.  T. DAYE Supplies Drugs to HODGES; HODGES and HERNANDEZ Supply Drugs to P.
       WILLIAMS ........................................................................................................... 30

  G.  MATTHEW DRAYTON and JEAN AMAN .................................................. 34

     1.  AMAN Supplies Drugs to M. DRAYTON ...................................................... 34

     2.  AMAN and M. DRAYTON Attempt Another Drug Deal ................................. 38

  H.  KEITH DAYE and TERRENCE DAYE ........................................................ 40

     1.  T. DAYE Seeks Cocaine from K. DAYE .......................................................... 40

     2.  K. DAYE Supplies Cocaine to G.R. ................................................................. 41

IV.    CONCLUSION .................................................................................................. 44

**AFFIDAVIT**

I, James Peters, Task Force Officer, U.S. Drug Enforcement Administration ("DEA"), being sworn, depose and state as follows in support of my application for a complaint charging **MATTHEW DRAYTON, KENJI DRAYTON, ARTHUR HODGES, JEAN AMAN, NELSIN HERNANDEZ, TERRENCE DAYE, KEITH DAYE,** and **PHILLIP WILLIAMS** (collectively, the "Target Subjects").  As set forth below, I believe there is probable cause to believe the Target Subjects have conspired to possess with intent to distribute and distribute controlled substances, including cocaine and cocaine base, Schedule II controlled substances, in violation of Title 21, United States Code, Section 846 ("the Target Offense").

## I.    INTRODUCTION

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

2.      I have been assigned as a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") since 2016.  I am dually assigned as a Detective with the Braintree Police Department Drug Control Unit since February 2014 and to the Boston Office of the New England Division of the DEA since June 2016, where I am currently assigned to Task Force Group 5.

3.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of Title 21 and Title 18 of the United Stated Code.  I received training regarding narcotics investigations while attending the DEA Basic Narcotics School and attended additional specialized training courses in furtherance of my past and current assignments.

4.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, introduction of undercover agents, execution of search warrants, effecting arrests, and debriefing defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I also have reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I became familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I also became familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

5.     Based on my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance.  Thus, drug traffickers frequently change cellular telephone numbers and/or cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where a phone's subscriber is not required to provide personal identifying information), and use cellular telephones subscribed under a different person's identifying information to thwart law enforcement's use of electronic surveillance.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business to prevent detection and often use text messages in lieu of phone calls to avoid speaking over the telephone.

6.     The facts in this Affidavit have come from my personal observations, my training and experience, and information obtained from other agents, task force officers, and state and local law enforcement officers.  The word "agent" or "investigator" is used in this Affidavit for all

federal, state, and local law enforcement officers.  This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint charging **MATTHEW DRAYTON (M. DRAYTON), KENJI DRAYTON (K. DRAYTON), ARTHUR HODGES (HODGES), JEAN AMAN (AMAN), NELSIN HERNANDEZ (HERNANDEZ), TERRENCE DAYE (T. DAYE), KEITH DAYE (K. DAYE)**, and **PHILIP WILLIAMS (P. WILLIAMS)** ("Target Subjects") with conspiring to distribute and to possess with intent to distribute cocaine and cocaine base, Schedule II controlled substances, in violation of Title 21, United States Code, Section 846.

7.     Since this affidavit is being submitted for the limited purpose of securing the requested arrest warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the requested arrest warrants.

## II.     SUMMARY OF THE INVESTIGATION

### A.  Background of the Investigation

8.     This case involves an approximate 10-month investigation by the Drug Enforcement Administration, working with other state and local agencies, including the Boston Police Department ("BPD"), between approximately November 2018 and September 2019.  That investigation focused on the drug-distribution activities of a drug-trafficking organization ("DTO") that Matthew DRAYTON and Arthur HODGES, along with their co-conspirators, operated within the Boston area.  The investigation also ultimately resulted in a broader investigation into one of M. DRAYTON's co-conspirators, his brother K. DRAYTON, who ran a separate and complementary drug-trafficking conspiracy (which has been charged by a separate complaint).

9.      M. DRAYTON and HODGES, along with their co-conspirators, used locations in the Commonwealth Development in Brighton, Massachusetts ("Fidelis Way") in Brighton, Massachusetts, to distribute cocaine and cocaine base ("crack") in Boston, Massachusetts. Fidelis Way is a multi-apartment public housing development whose residents range from multi-generation families to elderly individuals. The investigation showed that M. DRAYTON, HODGES, and their associates, through their drug-trafficking activities, assumed control over multiple Fidelis Way apartments, which they operated as "stash house" locations where they stored, cooked, packaged, and sold their drugs.

10.     The investigation involved controlled purchases of narcotics, physical surveillance, pole camera surveillance, review of subscriber data, review of pen register and trap and trace information, analysis of telephone records, and executing search warrants, including for precise location information from cellular telephones. The investigation also involved the interception of wire and/or electronic communications from over twenty cellular telephones belonging to various Target Subjects over an approximate thirteen-month period.

11.     Initially, the investigation involved over ten controlled purchases of drugs from M. DRAYTON, HODGES, and K. DRAYTON (collectively). In May 2019, agents first received authorization to intercept wire and/or electronic communications from various Target Subjects' cellular telephones, beginning with M. DRAYTON. As the wire investigation progressed, investigators identified M. DRAYTON and HODGES conspiring regarding drug supply and drug distribution within their DTO. Physical and electronic surveillance further corroborated HODGES and M. DRAYTON's drug-distribution business relationship and resulted in the identification of drug suppliers, drug distributors, drug runners, and drug customers. In particular, as a result of the investigation into M. DRAYTON, investigators identified K. DRAYTON as one of M.

4

DRAYTON's main suppliers, and Arthur HODGES as one of M. DRAYTON's main distributors who also has mainly overseen the drug-trafficking activities within Fidelis Way.  Further, the investigation has identified other supplies, including Terrence DAYE, Jean AMAN, and Keith DAYE, within the M. DRAYTON-HODGES DTO.  Investigators also intercepted and surveilled the M. DRAYTON-HODGES DTO's drug distributors and drug runners, including Nelsin HERNANDEZ and Philip WILLIAMS.

### B.   The Wire Investigation

12.     Based on the initial investigation into M. DRAYTON from November 2018 to May 2019, law enforcement investigators concluded that M. DRAYTON engaged in drug-trafficking activities with others within the Boston area.  In May 2019, law enforcement investigators received authorization to intercept wire and electronic communications from M. DRAYTON's cellular telephone.  These interceptions revealed that M. DRAYTON, in coded or vague language, arranged to distribute and distributed cocaine or cocaine base on a regular basis.  Interceptions from M. DRAYTON's cellular telephones identified other members of his drug trafficking organization, including K. DRAYTON (M. DRAYTON's brother), whom agents identified as one of M. DRAYTON's main suppliers; Arthur HODGES, another supplier and drug distributor for M. DRAYTON; HERNANDEZ, who distributed drugs for M. DRAYTON and HODGES; and T. DAYE, who supplied drugs to HODGES that he obtained from K. DAYE, his brother.  In addition to capturing M. DRAYTON's regular communications with co-conspirators about drug meetings, drug deliveries, drug supply, and drug sales, agents corroborated the intercepted drug-trafficking calls with surveillance.

13.     Over the course of this investigation, federal agents and task force officers have purchased and seized approximately 700 grams of a controlled substance that initial testing has

confirmed to be cocaine (and which, based on my training and experience, consists of both powdered cocaine and cocaine base) and approximately twenty-seven pounds of marijuana. Investigators also have seized about $200,000 in cash, over 200 rounds of ammunition, and at least one firearm.   Some of these seizures, along with related intercepted communications and surveillance observations, are described herein.

14.      Below, I also describe numerous intercepted calls and identify the participants in those calls.  Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information.  I base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation.  Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.  All times referenced herein are approximate.

### III.   PROBABLE CAUSE

#### A.  M. DRAYTON and K. DRAYTON

##### 1.  K. DRAYTON Supplies Drugs to M. DRAYTON Who Distributes to Drug Customer G.P.

15.      On May 4, 2019, at 9:29 a.m., M. DRAYTON (on Target Telephone 1) received a call from K. DRAYTON (on Target Telephone 6).  M. DRAYTON said, "I call you all day.  I just jerked off cause Matthew's new stollo, then I had to buy da, some fucking garbage.  Waiting for this nigga to bring my fucking stash back nigga, fucking heated."  K. DRAYTON responded, "Dawg, I've been telling you, I've been trying to get up with you, I been told you that, that was saved."  M. DRAYTON said, "I'll call you when I get up."  Based on my training and experience,

I believe that M. DRAYTON was complaining to K. DRAYTON about not being able to get in touch with each other the day before to do a drug deal.  M. DRAYTON was upset that he had to purchase bad narcotics ("some fucking garbage") from another party.  K. DRAYTON told M. DRAYTON that he had narcotics saved for him ("I've been trying to get up with you, I been told you that, that was saved"), and both parties agreed to meet later that day.

16.     At 12:29 p.m. on May 4, 2019, M. DRAYTON used Target Telephone 1 to contact K. DRAYTON on Target Telephone 6.  M. DRAYTON said, "You want to meet me at 18?"  K. DRAYTON agreed.  Based on my work on the investigation, I believe that "18" was a reference to 18 Larchmont Street in Dorchester, Massachusetts, an identified stash house for M. DRAYTON and K. DRAYTON.  Shortly after the call, at 12:44 p.m., surveillance in the area of M. DRAYTON's residence at 117 Moreland Street in Roxbury, Massachusetts, observed a black 2008 Chevrolet Equinox with Massachusetts registration 5MX764, registered to M. DRAYTON's wife (the "black Equinox"), pull out of the driveway.  Surveillance attempted to follow the vehicle, but ultimately could not maintain surveillance.  Surveillance subsequently identified the car's driver as M. DRAYTON based on intercepted calls, ping information, and the car's movement patterns from M. DRAYTON's residence.

17.     At 12:54 p.m., minutes after surveillance saw the black Equinox leave M. DRAYTON's residence, M. DRAYTON used Target Telephone 1 to contact K. DRAYTON on Target Telephone 6.  M. DRAYTON said, "I'm at your door." K. DRAYTON responded, "Aight." The call then ended.  According to cellular site information, Target Telephone 1 was in the area of Park Street, Larchmont Street, and Greenbrier Street in Dorchester, Massachusetts.  Surveillance units responded to the area.  At 1:09 p.m., agents saw the black Equinox in front of 14 Larchmont Street – a short distance down from M. DRAYTON and K. DRAYTON's stash house at 18

7

Larchmont Street.  The car was parked and unoccupied.  At 2:11 p.m., surveillance observed a black male fitting M. DRAYTON's physical description leave the area of 18 Larchmont Street and walk to the black Equinox, enter it, and leave.  Subsequent calls between M. DRAYTON and K. DRAYTON confirmed they had met up that day.

18.     Shortly before M. DRAYTON met up with K. DRAYTON at 18 Larchmont Street, M. DRAYTON spoke with G.P. at 12:08 p.m. (on (617) 980-7483).[1]  M. DRAYTON told G.P., "Hey, I'm supposed to be going to meet somebody right now, so once I'm good, I'll call you." G.P. responded, "Alright, don't forget me, okay."  Based on my training and experience, I believe that M. DRAYTON told G.P. that he was going to obtain a supply of narcotics and that he would contact her once he was resupplied ("once I'm good, I'll call you").

19.     After M. DRAYTON met with K. DRAYTON at 18 Larchmont Street, agents intercepted a call between M. DRAYTON (using Target Telephone 1) and G.P. (at (617) 980-7483) at 2:12 p.m. that day.  M. DRAYTON instructed G.P. to "come down."  From my work on this investigation, I know that G.P. resided in Plainville, Massachusetts, a distance from M. DRAYTON's residence.  At 5:25 p.m., M. DRAYTON (on Target Telephone 1) and G.P. spoke. G.P. said, "Yeah.  I'm like five minutes away…what you want me to do?" M. DRAYTON responded, "Just…Just…go…pull…pull into the yard."  I believe that M. DRAYTON instructed G.P. to pull into the driveway of 117 Moreland Street, Boston, Massachusetts – his residence – for

---

[1] Investigators identified G.P. as the user of telephone number (617) 980-7483 after surveilling her arriving at locations that coincided with intercepted calls on Target Telephone 1 and that phone number.  Further, officers stopped G.P. on May 31, 2019, after she did a drug deal with M. DRAYTON (set forth *infra*).  Immediately after her traffic stop, investigators intercepted phone number (617) 980-7483 contacting M. DRAYTON with a female describing the traffic stop and referencing a prior deal with M. DRAYTON.  Investigators recognized G.P.'s voice from prior intercepted calls with M. DRAYTON and confirmed she was the user of the phone.

a narcotics transaction.  Minutes later, G.P. called M. DRAYTON (on Target Telephone 1) and told him she was "outside."  M. DRAYTON responded, "Alright.  Let me…um.  Let me tell her to come to the door.  Just come to the door."  At 5:38 p.m., M. DRAYTON (using Target Telephone 1) called his wife at (617) 749-5592 and asked, "Oh you seen her?", to which she responded, "Yeah, she is right here….what I'm I doing."  M. DRAYTON answered, "Four of them."

20.     Based on the call, I believe that M. DRAYTON instructed his wife to give G.P. four "eight balls" (drug terminology for 14 grams) of cocaine or cocaine base ("four of them"). From my narcotics training and experience, I know that a typical "eight ball" weighs approximately 3.5 grams, or one-eighth of an ounce.  Based on the call's coded language ("four of them"), and M. DRAYTON's later dealing with G.P. on a different date (set forth *infra*), which involved the seizure of 7 grams (or two eight balls) of cocaine base, I believe that M. DRAYTON likely told his wife to give G.P. four "eight balls" (i.e., 14 grams) of cocaine base.

21.     At the same time as M. DRAYTON and G.P.'s calls on May 4, 2019, surveillance units set up in the area of M. DRAYTON's residence at 117 Moreland Street.  Surveillance units saw a female, whom they recognized to be G.P. (based on their knowledge of the investigation and review of her driver's license photograph), arrive at M. DRAYTON's residence in a black 2014 Hyundai Sonata with Massachusetts registration 9XA265 ("G.P.'s Hyundai Sonata").  A review of records for that vehicle showed it was registered to G.P. at her address in Plainville, Massachusetts.

22.     On May 31, 2019, at 10:58 a.m., G.P. (using telephone (617) 980-7483) contacted M. DRAYTON on Target Telephone 1.  During the conversation, G.P. asked, "In like two hours." M. DRATYON responded, "I'm at work…You can come down towards…let me see if I can go grab it from the house and I'm a call you right, right back okay."  G.P. agreed.

23.     Minutes later, at 11:04 a.m., M. DRAYTON (using Target Telephone 1) contacted K. DRAYTON on Target Telephone 6 and asked, "Did you get to put that together for me? The ones you had?" K. DRAYTON responded, "Yeah.  I had some small complication. But nah I got you." M. DRAYTON said, "Aight, I'm saying.  There's no way you can get that over…Get that to me?  At my job…So that I can tell this lady like two hours." K. DRAYTON said, "Aight."

24.     At 11:06 a.m., M. DRAYTON (using Target Telephone 1) contacted G.P.  After greeting one another, M. DRAYTON told G.P., "Yeah, you can come.  You said two hours?" G.P. responded affirmatively.  M. DRAYTON said, "I'll be at my job.  I said Imma send you the address.  It's like right around the corner from my job."[2] G.P. responded, "Yeah, just send me the address, Okay."  One minute later, M. DRAYTON (using Target Telephone 1) texted G.P. the address, "791 tremont street. South end Boston Massachusetts."  G.P. texted back, "Thank you." Based on the brief and guarded nature of the intercepted call, as well as my experience, I believe that G.P. ordered drugs from M. DRAYTON.   At 11:35 a.m., surveillance units stationed themselves in the area of 791 Tremont Street.

25.     At about 12:40 p.m., M. DRAYTON (on Target Telephone 1) spoke with K. DRAYTON (on Target Telephone 6) and instructed him to take a right onto Mass Avenue and a left onto Shawmut Avenue.  At 12:43 p.m., surveillance observed K. DRAYTON enter a black CRV with Massachusetts registration 2SAF21 (the "black CRV").  A minute later, at about 12:44 p.m., surveillance observed M. DRAYTON meet with an unidentified male at Good Eats located on 1002 Tremont Street.  At 12:48 p.m., M. DRAYTON was observed leaving Good Eats and

---

[2] I know that M. DRAYTON works as a maintenance worker in the area of Tremont Street, Boston, and that he also runs a home improvement company.

walking towards Shawmut Avenue.  At 12:52 p.m., surveillance observed M. DRAYTON enter the same black CRV that they had previously observed K. DRAYTON entering, which was then on Shawmut Avenue.  One minute later, M. DRAYTON left K. DRAYTON's car and walked away.  Based on the prior intercepted communications between M. DRAYTON, K. DRAYTON, and G.P., I believe that M. DRAYTON met with K. DRAYTON to obtain drugs for her.

26.     At 1:23 p.m., surveillance units observed the following:  G.P.'s Hyundai Sonata arrived in the area of 791 Tremont Street, M. DRAYTON got in, and G.P. drove a short distance on Tremont Street before pulling over.  M. DRAYTON then exited G.P.'s Hyundai Sonata, and G.P. drove away.  Based on the prior calls' context and surveillance's observations, I believe that M. DRAYTON sold G.P. narcotics.

27.     Surveillance followed G.P. without stopping until she reached the area of Waverly Street in Roxbury, Massachusetts.  Once there, state police officers conducted a traffic stop on G.P.'s Hyundai Sonata in the area of 44 Waverly Street, Roxbury, Massachusetts.  During the traffic stop, officers recovered from G.P. approximately 7 grams of a white, rock-like substance that appeared to officers to be consistent with cocaine base.  Additionally, the substance field tested positive for cocaine base.  The suspected cocaine base was packaged in four separate plastic bags. The officers did not arrest G.P. and sent her on her way.  G.P. has not been charged at this time.

28.     At 2:29 p.m., after the above seizure occurred, G.P. called M. DRAYTON on Target Telephone 1.  G.P. told M. DRAYTON about the traffic stop saying, "They took my shit, he gave me his number and he told me to call him, that's all he did to me....I'm telling you what happened, he took what I had and told me to call him.  I don't know for what the fuck he want me to call him for, they were crooked cops." M. DRAYTON asked, "What did he say?" G.P. responded, "Nothing he just gave me his number and said if I had something else, I said I don't

have nothing else...I only have that.  I told him what I had.  They took it, it was three fucking cops, same old cops that are always around Dorchester."  G.P. continued, "they took my shit and then he...Tony the...told me you better call me Monday.  I'm like for what?  I got nothing to tell you.  I got nothing to tell you, so okay I'll call you.  But whatever he say to me, don't worry man, I'm not going to say nothing about you.  Believe me."  M. DRAYTON asked, "He said he followed you or something?"  G.P. responded, "No, he said I made the wrong turn on Westerly, going to Merengue....I don't know where they were following me from but yeah they stopped me there.  So I'm telling you be careful."  M. DRAYTON responded, "Alright."  G.P. added, "I tell you what the fuck he want me to say, whatever he say, Imma say somebody got it for me in New York, whatever he...you know what I'm say, I'm not going to mention you."  M. DRAYTON responded, "Right, right of course."

29.     Based on my training, experience, and this investigation, I believe that G.P. told M. DRAYTON about the traffic stop in which BPD officers seized narcotics originally from M. DRAYTON.   G.P. then assured M. DRAYTON that she would not tell the police that M. DRAYTON was her source of supply.

### 2.   K. DRAYTON and M. DRAYTON Coordinate an Upcoming Narcotics Supply and Discuss Money Owed from Drug Customer

30.     On May 20, 2019, at 7:28 p.m., M. DRAYTON received a call on Target Telephone 1 from K. DRAYTON on Target Telephone 6.  During the conversation, M. DRAYTON said, "I'm all the way, I'm in Natick right now.  On my way back that way.  I just gotta, I was hoping that, know what I mean?  Bout to see it."  K. DRAYTON responded, "Yeah man, you won't send that back, just holla at me when you get back."  Based on my training and experience, I believe that M. DRAYTON and K. DRAYTON were waiting for a supply of cocaine.  M. DRAYTON indicated that he was hoping to see the cocaine that they were going to be supplied with ("I was

hoping that, know what I mean? Bout to see it") to verify its quality.  K. DRAYTON, in turn, believed the quality would be good ("You won't send that back").

31.     About a half hour later, at 8:00 p.m., M. DRAYTON (on Target Telephone 1) called K. DRAYTON (on Target Telephone 6).  M. DRAYTON said, "Yeah, so, we already good or we gotta make it happen?" K. DRAYTON replied, "Nah, it's about to happen, and fucking um, Spizzy down here." K. DRAYTON added, "I said Bigs is down here.  You wanna speak to him?"  M. DRAYTON responded, "Nah!  Take my rack from da motherfucker!"  K. DRAYTON said, "Nah, nah, nah, I already know all that, but I thought you was gonna [u/i] too?"  M. DRAYTON replied, "Nah! Fuck that nigga! Take the rack from that shit, nigga!  Know what I mean?  Let them figure it out.  Waited long enough, nigga, waited long enough man.  Need every dime for this, for this crib."  M. DRAYTON and K. DRAYTON continued to discuss collecting the "rack," and M. DRAYTON said, "Yeah if you can just grab, you know grab that shit for me, bro, I would appreciate it man, we leaving Natick now man, so…"  K. DRAYTON replied, "Yeah man, absolutely."  M. DRAYTON replied, "Alright, I'll see you in a minute, you already, you already up at 18?"  K. DRAYTON responded, "Nah, I asked them later on today to give me the key, but we, know what I mean, I'm waitin down here so, near Auntie."

32.     Based on this investigation and the intercepted call, I believe that K. DRAYTON was waiting to be supplied with illegal narcotics ("it's about to happen").  Additionally, I believe that K. DRAYTON's reference to "Bigs" is to an unidentified male who owed M. DRAYTON money for drugs that he had previously fronted "Bigs" ("Take my rack from da motherfucker" and "Waited long enough, nigga, waited long enough man. Need every dime for this, for this crib").  I know from training and experience that a "rack" is drug code for $1,000. Also, K. DRAYTON

indicated that he was not yet at "18," which referred to his and M. DRAYTON's stash house at 18 Larchmont Street in Dorchester, Massachusetts.

33.     On May 28, 2019, at 5:26 p.m., video surveillance observed M. DRAYTON arrive at 18 Larchmont Street driving a blue van with New Hampshire registration 3620620.   M. DRAYTON parked the van across the street from 18 Larchmont Street.   About a minute later, at 5:27 p.m., agents via video surveillance saw a dark-colored 2007 Toyota Corolla with Massachusetts registration 7CY215 arrive (registered to L.W.).   Surveillance saw M. DRAYTON and an individual whom surveillance subsequently confirmed as L.W.[3] (based on his car registration records, telephone records, and his physical stature, which was consistent with his driver's license photograph) briefly meet outside of their cars before reentering their respective vehicles.   At 5:37 p.m., surveillance saw K. DRAYTON arrive as a passenger in  the black Honda CRV, exit the car, open the door at 18 Larchmont Street, and allow M. DRAYTON and L.W. to enter.   Less than ten minutes later, at 5:52 p.m., surveillance units saw K. DRAYTON exit 18 Larchmont Street.   M. DRAYTON and L.W. remained inside the residence until 6:51 p.m., when surveillance saw them leave.   Based on training, experience, and knowledge of this investigation, I believe that M. DRAYTON and L.W. stayed inside 18 Larchmont Street to package narcotics for resale.   In particular, earlier that day, agents noted multiple brief calls on a court-authorized pen register showing contact between telephone number, (617) 506-8600, subscribed to L.W.'s home

---

[3] Agents reviewed Massachusetts Board of Probation's records and learned that L.W. has a criminal history that includes distribution of Class B (crack cocaine) drugs (Guilty, 2008), distribution of Class B (crack cocaine) drugs (Guilty, 2005), and distribution of a controlled substance in a school zone (Guilty, 2005).  K. DRAYTON and L.W. also previously were charged in 2001 with homicide. L.W. was acquitted at trial; K. DRAYTON was convicted of first degree murder, appealed his conviction, and had his conviction reduced to manslaughter on appeal.

address, and K. DRAYTON on Target Telephone 6.   The content of those calls were not intercepted.   Further review of phone number (617) 506-8600, however, showed that L.W. had listed that same number on an accident report filed in June 2017.   Those calls occurred at 3:32 p.m. (31 seconds), 4:02 p.m. (27 seconds), and 5:16 p.m. (29 seconds).   The repeated and brief nature of those calls were consistent with drug-trafficking.

### 3.   K. DRAYTON and M. DRAYTON Discuss Drug Supply Needs

34.      On July 2, 2019 at 8:01 p.m., K. DRAYTON (on Target Telephone 8) called M. DRAYTON (on Target Telephone 1).   K. DRAYTON said, "Where are you?"   M. DRAYTON responded, "About to leave June's shop."   K. DRAYTON responded, "Man, I was trying to get out with you.   Hey, you don't got nothing left?"   M. DRAYTON said, "Ummmm, yeah, yeah, really."   K. DRAYTON responded, "Damn, I most definitely need to get out with you."   M. DRAYTON then said, "Actually, actually I don't think so, actually I don't. Cause Clock just called me, I'm not sure, I don't even sure yet, I gonna have to go check."   K. DRAYTON responded, "Alright."   M. DRAYTON continued, "And I can't go to the bricks right now cause Nunez and them up there."   K. DRAYTON again said, "Alright."   M. DRAYTON explained, "That's why I am just waiting."   K. DRAYTON responded, "Alright, well try to figure it out."

35.      Based on this call and the investigation, I believe that K. DRAYTON told M. DRAYTON he was out of cocaine and wanted to see if M. DRAYTON had any cocaine left ("you don't got nothing left?" and "Damn, I most definitely need to get out with you").   From the conversation, it appeared that M. DRAYTON initially thought he had some, but then noted he was "gonna have to go check."   M. DRAYTON also commented that he could not go to the "bricks" because "Nunez and them up there."   I know that "bricks" is code within the M. DRAYTON-HODGES DTO for the Fidelis Way public housing complex.   Further, I believe that "Nunez" is a

reference to Boston Police Officer Jason Nunez, who arrested an individual at 2-8 Fidelis Way for domestic assault and battery the same day (i.e., July 2, 2019) as M. DRAYTON and K. DRAYTON's call, and who was known to them as a longtime member of the local Boston Police Drug Control Unit.  Officers who had been in the area of 2-8 Fidelis Way conducting electronic surveillance for purposes of this investigation responded to the disturbance call that resulted in the domestic assault arrest.  I believe that M. DRAYTON was concerned over law enforcement presence at Fidelis Way, especially because he apparently did not know yet why law enforcement had been at one of the M. DRAYTON-HODGES DTO's main distribution locations at Fidelis Way.

36.     Over an hour later, at 9:30 p.m., K. DRAYTON (on Target Telephone 8) called M. DRAYTON (on Target Telephone 1).  K. DRAYTON said, "Dude just hit back, so I'm about to see what it is.  I just need to go today.  But he was just heading back."  M. DRAYTON responded, "Yeah, I'm about to come down there now."  K. DRAYTON said, "Huh?"  M. DRAYTON replied, "I'm about to come to you right now."   K. DRAYTON said, "Yeah, I'm in Norwood."  M. DRAYTON responded, "Oh, I ain't coming there."   K. DRAYTON said, "But, nah, I'm gonna shoot straight down there.  I was just trying to hit every avenue.  My sis going crazy.  I'mma hit you as soon as I get down there."   Based on the conversation, I believe that K. DRAYTON informed M. DRAYTON that his (K. DRAYTON's) cocaine supplier had called K. DRAYTON back and he was going to meet with the supplier ("Dude just hit back, so I'm about to see what it is").

## B. MATTHEW DRAYTON and ARTHUR HODGES

### 1. M. DRAYTON and HODGES Compare Drugs with Other Suppliers' Quality

37.     On June 23, 2019, at 2:52 p.m., M. DRAYTON (on Target Telephone 1) called HODGES (on Target Telephone 3).  During the conversation, M. DRAYTON said, "Bro, those niggas ain't done yet, bro.  This shit is crazy, man."  HODGES responded, "Taking forever."  M. DRAYTON replied, "Them niggas, I think they got other twerk, bro.  They getting twerk from someone else, bro.  That shit is not the same shit that I got, bro.  That shit is like aggravating me man.  These niggas are able to spend money with other mother fuckers, bro.  Like I'm over here cuffing twerk off of people, bro.  Like this shit is crazy, bro.  You know what I mean?  And that shit that Ave, it's not the same shit."  HODGES responded, "Ave, Ave, Ave is done."  Based on my work on this case, as well as communications with other investigators familiar with "Ave" from other drug investigations, I know that "Ave" is a reference to A.W., a drug runner for HODGES.  Additionally, I know that "twerk" is street slang for "work" or "drugs."

38.     M. DRAYTON then said, "The shit that Ave had last night it's not what we have, bro.  That's the shit, trust me."  HODGES responded, "That was, he is done right now, he don't have it."  M. DRAYTON said, "The shit, this shit is getting crazy bro, nigga.  I'm about to park nigga.  I just bust Clock in the fucking head with a hammer bro.  Like…"  HODGES responded, "What the fuck, Clock?"  Based on my work on this case, I believe that "Clock" is a nickname for D.S., whom agents have intercepted speaking with M. DRAYTON on Target Telephone 1 about drugs.  In at least some of those calls, the nickname "Clock" is used.  In addition to those intercepted calls, I know from communications with other investigators on this case that D.S. has been identified as having the nickname, "Clock," in other investigations.  During this investigation,

investigators have identified D.S. as one of M. DRAYTON'S drug runners whom surveillance has observed waiting to meet with M. DRAYTON to obtain cocaine base for subsequent deals.

39.     HODGES and M. DRAYTON continued discussing the quality of other suppliers' product and M. DRAYTON's views that HODGES should not acquire product from other dealers. M. DRAYTON stated, "And tell Dodge, tell the niggas bro.  Don't get no shit from nowhere else bro cause I'm gonna start checking niggas twerk, niggas don't got that shit, bro.  That shit, shit, this shit gotta stop, man.  I can't, I'm over here cuffing twerk from other motherfuckers, these niggas is eating bro.  Like nigga, this shit is not right nigga.  Like, this shit is not right, man.  You know what I'm saying?  These niggas, this shit is out of bound, bro like, out of bounds man.  An then this stupid nigga go over there all fucking night, go come to me with a hundred and something dollars, talking about how he is cuffing, he is cuffing.  He is cuffing?"  HODGES said, "I told him don't cuff."

40.     I know that the term, "cuff," is street slang for providing someone drugs in advance of payment (i.e., fronting the drugs), thereby helping to ensure that the dealer will return to the same supplier.  HODGES and M. DRAYTON continued to discuss that they should no longer use other suppliers' product because M. DRAYTON is giving product out without receiving the money up front ("cuffing") and therefore he is losing money because he is not getting a return on the product ("Don't get no shit from nowhere else bro cause I'm gonna start checking niggas twerk" and "I'm over here cuffing twerk from other motherfuckers, these niggas is eating bro . . . this shit is out of bound").  Additionally, M. DRAYTON discussed using violence to keep his drug runners – in particular, D.S. – in line ("I just bust Clock in the fucking head with a hammer bro").  Based on the call, I believe that M. DRAYTON instructed HODGES to make sure that HODGES or his drug runners or distributors were selling M. DRAYTON's cocaine base instead of others' product.

18

I also believe that HODGES's drug runners, including Nelsin HERNANDEZ, A.W., R.I., and I.G. (the latter of whom are referenced further herein), worked out of the Fidelis Way Housing Department on HODGES's behalf.

### C.  ARTHUR HODGES and PHILLIP WILLIAMS

#### 1.  <u>HODGES supplied P. WILLIAMS with Drugs for Distribution</u>

41.     On May 7, 2019, at 11:09 a.m., HODGES received a call on Target Telephone 3 from P. WILLIAMS on telephone number (857) 249-6298.[4]  P. WILLIAMS asked, "You got… straight or you going to come here?"  HODGES replied, "What you want to talk about… bring it." P. WILLIAMS responded, "Umm, bring about three of them."  HODGES replied, "Three? I gotcha."  P. WILLIAMS said, "Alright. See what…"  The call then ended.  Based on the brief and vague nature of the call, I believe that P. WILLIAMS called HODGES to obtain narcotics ("bring about three of them"), which HODGES agreed to do ("Three? I gotcha").  From my experience and work on this case, I believe that "three," in this context, refers to three units of cocaine, such as an ounce.  Subsequent intercepted calls on May 7, 2019, further confirm my belief that P. WILLIAMS and HODGES were referring to three ounces, as set forth below.

42.     Several hours later, at 2:20 p.m., HODGES used Target Telephone 3 to call P. WILLIAMS on telephone number (857) 249-6298.  HODGES asked, "Are you close? I'm trying to leave."  P. WILLIAMS replied, "Oh, you can leave it with someone?"  HODGES responded, "Ah, let me call Richie right now."  P. WILLIAMS said, "Yo! Yo! Yo!"  HODGES responded, "Huh?"  P. WILLIAMS asked, "You only got two or three?"  HODGES responded, "I only got

---

[4] On June 19, 2019, at approximately 6:39 p.m., agents surveilling P. WILLIAMS contacted telephone number (857) 249-6298.  Agents observed P. WILLIAMS retrieve a cellular telephone from his pocket, place it to his ear, and answer the call.

two right now, but I'm coming back.  I'm coming back.  I have it when I come back."  P. WILLIAMS replied, "Alright."  HODGES explained, "I just need to step out real quick."

43.     I believe that HODGES contacted P. WILLIAMS to verify his location ("are you close? I'm trying to leave") because HODGES had to obtain more drug product ("I have it when I come back").  P. WILLIAMS inquired about HODGES's drug supply ("you only got two or three?") and asked whether HODGES could leave the drugs with someone for P. WILLIAMS to collect ("you can leave it with someone?").  HODGES informed P. WILLIAMS that he only had two ounces ("I only got two right now"), but that he would have more when he returned to the house.  I believe that HODGES was planning to meet with someone to re-up his cocaine supply.

44.     Immediately after ending his call with P. WILLIAMS, at about 2:20 p.m., HODGES used Target Telephone 3 to call R.I., an identified drug runner for HODGES, on telephone number (857) 237-3442.[5]  HODGES said, "Phillip [i.e., P. WILLIAMS] said that if he can hold this shit real quick."  R.I. asked, "Who?"  HODGES replied, "Phillip said if he can hold this shit real quick. I'm about to leave, real quick."  R.I. replied, "Why don't you just put it away bro?"  HODGES responded: "I'm leaving.  He asked me to call you to ask."  R.I. asked, "Where he at?"  HODGES answered, "He's on his way.  That's why."  R.I. said, "Oh."  Based on the intercepted call, as well as my work on this case, I believe that HODGES called R.I. to see if R.I. could deliver HODGES's two ounces of cocaine to P. WILLIAMS, who was then en route to obtain drugs.

---

[5] Investigators initially identified telephone number (857) 237-3442 as R.I.'s number through a confidential source, who had identified R.I. as "Richie" and as a drug runner for HODGES.  Other intercepted calls between HODGES on Target Telephone 3 and phone number (857) 237-3442 had HODGES referring to the caller as "Richie."

45.     About a half hour later, at 2:52 p.m., HODGES received a call on Target Telephone 3 from P. WILLIAMS on telephone number (857) 249-6298.  HODGES told P. WILLIAMS, "Richie [i.e., R.I.] is there, where do you want me to tell him to go?"  P. WILLIAMS responded, "Huh?"  HODGES repeated, "Richie there.  I gave it to Richie.  I gave it to Richie, where do you want me to tell him to go."  P. WILLIAMS replied, "I'll be in the hood in like fifteen minutes.  I'm going to go to the (u/i) back parking lot."  HODGES said, "Alright. I'll tell Richie."  From these calls, I believe that HODGES gave the two ounces of cocaine for P. WILLIAMS to R.I., HODGES's drug runner, to provide to P. WILLIAMS.

### D.  MATTHEW DRAYTON, ARTHUR HODGES, and NELSIN HERNANDEZ

#### 1.  M. DRAYTON Supplies HODGES and N. HERNANDEZ with Drugs

46.     On May 8, 2019, at 8:27 p.m., HODGES (on Target Telephone 3) called Nelsin HERNANDEZ, a/k/a "Sito," on telephone number (857) 318-3851. [6,7]  During the conversation, HODGES told HERNANDEZ, "He's going to bring you four, and I'll have Richie grab two."  HERNANDEZ responded, "Alright."   I believe that HODGES told HERNANDEZ that an unknown individual ("he") would be bringing HERNANDEZ "four" of an unspecified quantity of cocaine or cocaine base and that "Richie" (i.e., R.I., a drug runner for HODGES) would take "two"

---

[6] Investigators know that HERNANDEZ's nickname is "Sito" because HODGES has called HERNANDEZ "Sito" directly on intercepted calls on Target Telephone 3.  HODGES also has referred to "Sito" on calls with others in which subsequent surveillance has then observed HERNANDEZ, further supporting investigators' belief that Sito is HERNANDEZ's nickname.  Lastly, on July 3, 2019, HODGES called "Sito" on telephone number (857) 318-3851, and investigators recognized HERNANDEZ's voice answering the phone.

[7] On July 3, 2019, surveillance units observed HERNANDEZ in the area of 34 Fidelis Way. During their surveillance, agents called telephone number (857) 318-3851 and observed HERNANDEZ answer the phone.  Agents conducting the call also heard HERNANDEZ's voice answering the call.

from that.  From my narcotics experience, I believe that HODGES' references to "two" and "four" were to "eight ball" quantities of cocaine (i.e., 3.5 grams per bag).  Thus, I believe that HERNANDEZ was to receive four eight balls (totaling 14 grams of cocaine), and that R.I. was to take two eight balls (7 grams) from that.

47.     On May 16, 2019, at 2:17 p.m., HODGES (on Target Telephone 3) called HERNANDEZ at (857) 318-3851 and asked HERNANDEZ, "Did you bag up that one yet or no?" HERNANDEZ replied, "I just broke down one piece."  HODGES responded, "Alright.  Well let me know when you getting up.  In case people call."  At 4:23 p.m., HERENANDZ texted HODGES, "I'm up bro."  HODGES responded affirmatively.  I believe that HODGES asked HERNANDEZ if the drugs ("one piece") were ready for distribution, and HERNANDEZ responded that he was in the process of preparing the drugs for distribution ("I just broke down one piece").

48.     On May 19, 2019, at 12:11 p.m., HERNANDEZ called HODGES on Target Telephone 3.  HERNANDEZ said, "I'm about to head there too, that's why I'm calling I need to grab some work."  HODGES then said, "You said what? People calling you said?"  HERNANDEZ replied, "Yeah, people are starting to call.  I need to grab some work."  From my work on narcotics investigations, I know that the phrase, "work," is common drug-trafficking code for drugs.  When HERNANDEZ told HODGES that he needed "work," I believe that he meant he needed drugs from HODGES so that he could sell them to the "people [] calling."

49.     On May 20, 2019, at 11:45 a.m., HODGES (on Target Telephone 3) called HERNANDEZ and told him that Linda wanted some.  HERNANDEZ responded he only had "one."  HODGES said he would tell her to go there, which I believe is a reference to Fidelis Way. Based on the conversation and call history, I believe that HODGES wanted to confirm whether

HERNANDEZ had any narcotics left for sale.  HERNANDEZ responded that he only had one bag of crack cocaine left for sale. At 3:40 p.m., HODGES called HERNANDEZ and said, "Bugs is over at Tammy's, he want the last one."  HERNANDEZ responded, "I already sold it…5 minutes ago.  Like 5 minutes ago I just sold it."  Based on the context of the conversation, I believe that HODGES wanted HERNANDEZ to sell "Bugs" drugs, but HERNANDEZ had already sold all of his product, possibly to "Linda."  Further, I believe that "Bugs" is the nickname of I.G., a drug runner for HODGES.  Based on my work on this case, including a review of Facebook pages for potential targets, I know there is a Facebook account for "BugsyMurMur" that shows images of a male that match I.G.'s driver's license photograph.  Further, there is a Youtube rap video of I.G. at Fidelis Way titled, "BugsyMurMur TrapStar," which shows I.G. rapping.  The theme of that rap video is selling cocaine and being caught by the "feds."

50.     Later that same day, at 6:53 p.m., M. DRAYTON (on Target Telephone 1) received a call from HODGES on Target Telephone 3. During the conversation, HODGES asked, "You forgot about Sito?"  M. DRAYTON said, "Nah man, he's just now, I'm like damn near by Monastery Road, I'm on Monastery Road.  I was just about to call you on my other phone.  If I'm outta here I would've fucking called you.  Tell Sito to come to the door, Jump Man's got something to do." HODGES instructed M. DRAYTON, "Give him, he asked, he asked for two bro."  I believe that HODGES told M. DRAYTON that HERNANDEZ – nicknamed "Sito" – wanted "two" 3.5 grams bags of cocaine base from M. DRAYTON.  As previously noted, I know that 3.5 grams of cocaine is commonly referred to as an "eight ball," a drug amount that M. DRAYTON commonly dealt in.

51.     At 8:21 p.m. that same day (May 20, 2019), surveillance observed a blue van with

New Hampshire registration 3620620 arrive and park in the area of 34 Fidelis Way, which is the apartment building where HERNANDEZ's residence, Apartment 568, is located.   Surveillance observed M. DRAYTON exit from the van's passenger side and walk towards a male whom surveillance identified as likely I.G. ("Bugs").   A third male – who was not identified at the time – joined M. DRAYTON and I.G. in the area of Jette Court.   The three males walked to the rear of 29 Jette Court (from where surveillance could not observe them). At 8:24 p.m., surveillance observed M. DRAYTON and I.G. walk back out from behind 29 Jette Court, at which point law enforcement could positively identify I.G.   M. DRAYTON and I.G. then separated.   M. DRAYTON returned to the blue van, entered the passenger seat, and left the area.   Based on the prior intercepted conversations and the length of their meeting, which was just long enough for an exchange, I believe that M. DRAYTON delivered drugs.

52.     Less than an hour after M. DRAYTON and I.G.'s meeting outside of HERNANDEZ's residence, at 9:30 p.m. HODGES (on Target Telephone 3) called HERNANDEZ. HODGES asked, "Fuck ya doing?"   HERNANDEZ replied, "I'm saying start bagging up the rest of this shit right now."   HODGES asked, "Why? People calling?"   HERNANDEZ replied, "Yeah." I believe that HERNANDEZ told HODGES he (HERNANDEZ) was packaging drugs for re-sale in consumption quantities ("bagging up this shit right now") for the "people calling."   I also believe that the drugs that HERNANDEZ was bagging had just come from M. DRAYTON.

53.     On May 21, 2019, at 1:11 p.m. (the day after M. DRAYTON's meeting outside of HERNANDEZ's residence), HODGES called HERNANDEZ.   HERNANDEZ said, "I grabbed some candy last night."   HODGES said, "Oh.   But, ah you done? Or no?"   HERNANDEZ responded. "Nah, I still got some."   HODGES said, "Alright, Bugs brought his one piece already?" HERNANDEZ responded, "yeah."   Based on the conversation, I believe that HODGES wanted to

know whether HERNANDEZ still had drugs ("ah you done?") and whether their mutual acquaintance, "Bugs" (i.e., I.G.) had brought him narcotics ("Bugs brought his one piece already?"). I know that "one piece" is code for a rock (i.e., .2 grams) of crack cocaine, which is a user quantity. Based on the call's overall context, I believe that HODGES is taking inventory of the remaining drug supply and confirming whether Bugs had brought a rock ("one piece") of cocaine base, likely leftover from his drug sales, to HERNANDEZ.

### 2. **HERNANDEZ and HODGES Coordinate Drug Supplies**

54.     On May 31, 2019, at 6:37 p.m., HODGES (on Target Telephone 3) received a call from HERNANDEZ on (857) 318-3851. During the conversation, HERNANDEZ stated, "Big Jim wanna know if you can give seven for two." HODGES responded, "Seven for two…fuck bro." I believe "seven for two" to mean seven grams of cocaine (i.e., two eight balls) for $200. HERNANDEZ responded, "I told him six but…" HODGES responded, "Bugs left seven pieces, right?" HERNANDEZ responded, "He left the half here and two pieces." HODGES said, "He left half here and two pieces? Fuck…for two? What does he got, 200? Just give the half piece and two pieces, fuck it." I believe that HERNANDEZ and HODGES discussed how many pieces of crack cocaine to give to an unidentified male ("Big Jim") for $200. HODGES ultimately directed HERNANDEZ to give "Big Jim" "half and two pieces" of crack cocaine for $200, which I understand to be a half of an eight ball or 1.75 grams, and then two pieces of cocaine base.

55.     On July 15, 2019, at 1:21 p.m., HODGES (on Target Telephone 3) contacted HERNANDEZ at (857) 318-3851. During the conversation, HODGES said, "I just told Tammy to go wake you up, too. 'Cause she called." HERNANDEZ replied, "Yeah, (u/i)." HODGES asked, "You seen Tammy?" HERNANDEZ responded, "No, I just got in the house right now." HODGES said, "Oh, you just got there. So she should be there. Aight. How much you have

left?"  HERNANDEZ replied, "Uh six and, ninety-five dollars."  HODGES asked, "You got six pieces left?"  HERNANDEZ said, "Yeah, I have to go pay the bills so like ninety-five and six pieces."  HODGES responded, "Alright.  Tammy's coming anyways."  I believe that HODGES sent "Tammy" to HERNANDEZ to buy cocaine base.  HODGES also asked HERNANDEZ about his drug supply, to which HERNANDEZ answered, "six pieces," which I know from training and experience to be common drug code for six pieces (or "rocks") of cocaine base.  Based on my work on this case, I know that each rock of cocaine base purchased from HODGES during a controlled buy weighed approximately .15 to .20 grams.

### E.  ARTHUR HODGES and TERRENCE DAYE

#### 1.  T. DAYE Supplies HODGES with Drugs

56.     On May 6, 2019, at 6:24 p.m., HODGES (on Target Telephone 3) called T. DAYE (on Target Telephone 7).  HODGES said, "I need you man, I said I need you."  T. DAYE responded, "I'm grabbing some more right now.  I'm going to take it in."  I believe that HODGES was requesting drugs from T. DAYE, which he agreed to provide.  Agents subsequently surveilled a drug deal between HODGES and T. DAYE, described *infra*.

57.     That same evening, at 7:46 p.m., HODGES on Target Telephone 3 received a call from T. DAYE on Target Telephone 7.  T. DAYE said, "I'm on my way over there."  HODGES replied, "Aight, he is at 241, I already told him you coming."  T. DAYE said, "Aight, bet."  I believe that this call was a follow-up to the previous call and that T. DAYE was informing HODGES that he was going to deliver the drugs that HODGES had ordered from him.  HODGES then instructed T. DAYE to go to "241," which I know, from previous interceptions, referred to an apartment at 2-8 Fidelis Way from which HODGES sells cocaine and cocaine base and was where HODGES had a drug runner waiting.

58.     On May 6, 2019, at 8:31 p.m., HODGES on Target Telephone 3 received a call from T. DAYE on Target Telephone 7.  T. DAYE said, "I'm about to park. He is in 241?" HODGES replies, "Yeah, Ave, Aves, in 241, yup."  I believe that HODGES again confirmed T. DAYE's destination as Apartment 241 at 2-8 Fidelis Way.  HODGES also noted that A.W. ("Ave") – one of his drug runners – was waiting for T. DAYE's drug delivery.

59.     Also on May 6, 2019, minutes after the above call (about 8:35 p.m.), surveillance observed the following: a black 2019 Toyota Camry with Massachusetts registration 55W150 parked in the horse shoe parking area in front of 2-8 Fidelis Way.  The car's driver, a black male, entered the building after being buzzed in.  Investigators subsequently identified that black male as T. DAYE based on a comparison of surveillance footage with T. DAYE's driver's license photograph.  At 8:59 p.m., a tow truck, named Robert Towing, towed the black 2019 Toyota Camry. At 9:05 p.m., T. DAYE (the same individual seen previously entering the building) exited the building and noticed his vehicle was gone.   R.I. then exited 2-8 Fidelis Way talking on a cellular telephone.  Minutes later, the tow truck returned to 2-8 Fidelis Way with the towed car. T. DAYE briefly met with the tow truck driver and handed him something that the driver then placed into his pocket.  After some time, all parties separated and left the area.

60.     Based on the sequence of events, I believe that T. DAYE initially spoke with HODGES to coordinate re-supplying HODGES with cocaine.  T. DAYE then traveled to 2-8 Fidelis Way to supply HODGES's stash location in Apartment 241 with cocaine, which T. DAYE was to hand off to A.W. ("Ave").  While T. DAYE was carrying through with that plan, his car – parked at 2-8 Fidelis Way – was towed.  R.I. – one of HODGES's drug runners – called the tow truck driver and had the vehicle promptly returned.  I believe that the swift manner in which T. DAYE's car was returned speaks to the high level of control that HODGES and his associates

(e.g., R.I.) have over the Fidelis Way area, including over tow truck drivers, as they were able to have T. DAYE's vehicle returned quickly without having to proceed through normal channels. Investigators believe that R.I. may have known the tow truck driver, although they are not aware of their specific relationship.   Further, surveillance saw T. DAYE hand the tow truck driver something, which appeared to finalize the car's return.

61.     On May 12, 2019, at 1:19 p.m., T. DAYE (on Target Telephone 7) called HODGES (on Target Telephone 3). T. DAYE asked HODGES, "Was motherfuckers fucking with that shit?" HODGES responded, "I don't know…they didn't.  Nobody said anything so I guess it's straight. I'm try to get rid of the rest, the rest I grabbed from you…nobody said nothing so I guess, relief…ain't nobody complaining, so I don't know."  T. DAYE said, "As long as there ain't nobody complaining then let that shit fly."  HODGES stated, "We have to tell 'em, you have to tell 'em, tell 'em when you chef, when you chef that one up, you have to tell him."  T. DAYE responded, "Nah I had took, nah I gave, I gave that shit back to that nigga.  I have all that shit back to that nigga, I'm all set."  HODGES stated, "Yeah, that was, that was, the other half."  T. DAYE said, "Yeah, hell yeah I gave…I told him, I got, I got my peoples I used to see nigga, like if I knew it was gonna be some bullshit like this, I would've waited…the nigga was like yeah, no funny shit. I don't even be on no shit like that, you can just come and get your bread back.  I said hell yeah."

62.     I believe that T. DAYE called HODGES to see if HODGES had received any complaints about the cocaine that T. DAYE previously had supplied to HODGES ("Was motherfuckers fucking with that shit?").   HODGES responded that he had not received any complaints about T. DAYE's supplied drugs.  T. DAYE then informed HODGES that he had returned the drugs ("I gave that shit back to that nigga") to the unidentified supplier because the

product's quality was not good ("if I knew it was gonna be some bullshit like this, I would've waited"). This call further shows that T. DAYE supplied cocaine to HODGES.

### 2. **T. DAYE Supplies HODGES's Stash Locations at Fidelis Way**

63.    On May 13, 2019, at 12:18 p.m., HODGES (on Target Telephone 3) called T. DAYE (on Target Telephone 7).  HODGES asked, "Yeah, you straight yet or?"  T. DAYE responded, "Nah, I'm not straight yet…At six o'clock, if this nigga, if this nigga come before then, I'm just gonna try to get him to come meet me at my job."  Based on the call and my work on this case, I believe that HODGES wanted to know if T. DAYE had met with his source of supply.  At 5:07 p.m. that same day, T. DAYE called HODGES on Target Telephone 3 and stated, "I'm gonna um, be straight as soon as I get out of here. I'm going to meet him."  HODGES replied, "Alright that's straight, I need that thing like I said, too."  T. DAYE responded, "Yeah, I got you."  I believe that HODGES confirmed he wanted to purchase narcotics from T. DAYE ("I need that thing like I said, too") after T. DAYE met with his source of supply ("I'm gonna um, be straight as soon as I get out of here[;] I'm going to meet him").

64.    Hours later that same day, at 7:20 p.m., HODGES on Target Telephone 3 received a call from T. DAYE on Target Telephone 7.  HODGES asked, "You on your way?" T. DAYE replied, "I'm waiting outside for this nigga to pull up."  HODGES responded, "Aight, well, I'mma make my way there.  Since you on your way."  T. DAYE said, "What, you going over there to whatchamacallit?"  HODGES replied, "112."  I believe that T. DAYE was then waiting for a supplier to "pull up" and supply him with cocaine, which he would then bring to HODGES at 2-8 Fidelis Way, apartment 112 – another identified stash location within the Fidelis Way apartment complex based on intercepted calls in which HODGES directed distributors and/or runners there.

65.     On May 15, 2019, at 4:57 p.m., HODGES used Target Telephone 3 to call T. DAYE on Target Telephone 7.  HODGES asked where T. DAYE was, and he responded, "Mattapan." HODGES told T. DAYE, "Bring two four out there."  T. DAYE agreed to do so.  At 6:05 p.m., HODGES texted T. DAYE, "gave them three they got 410…they at 112."  I believe that HODGES wanted to purchase cocaine from T. DAYE – specifically, two ounces of crack cocaine for $2,400 ("bring two four out there") – and instructed T. DAYE to go to apartment "112" when he arrived at 2-8 Fidelis Way.  I also believe that HODGES confirmed he could pay T. DAYE upon delivery by stating, "gave them three they got 410."  From my work on this case, I know that "three" means $300, "410" means $410, and that "they" refers to the unknown person or people inside of apartment 112, who were waiting with cash on hand for T. DAYE's delivery.

## F.   ARTHUR HODGES, TERRENCE DAYE, NELSIN HERNANDEZ, and PHILLIP WILLIAMS

### 1.   T. DAYE Supplies Drugs to HODGES; HODGES and HERNANDEZ Supply Drugs to P. WILLIAMS

66.     On May 23, 2019, at 5:33 p.m., HODGES received a call on Target Telephone 3 from P. WILLIAMS on telephone number (857) 249-6298.[8]  P. WILLIAMS said, "I'm going to need that whole thing."  HODGES asked, "When, today?"  P. WILLIAMS responded, "Uhmmm." HODGES asked, "Tomorrow?"  P. WILLIAMS responded, "What's the earliest you can do it tomorrow?"  HODGES replied, "Tomorrow… I have to check.  Let me check.  I'll check and I'll let you know."  P. WILLIAMS responded, "What's the latest you can do tonight?"  HODGES

---

[8] As previously noted, on June 19, 2019, agents surveilling P. WILLIAMS contacted phone number (857) 249-6298, saw P. WILLIAMS retrieve a cellphone from his pocket, place it to his ear, and answer the call.  Additionally, investigators are familiar with P. WILLIAMS's voice from other intercepted calls and compared and recognized his voice to other intercepts, further confirming his link to this phone number.

replied, "I don't know.  That's why I'm saying.  Let me see and I'll call and see... I might... let me see if he can do it tonight. Let me see."  P. WILLIAMS replied, "Alright. If he can do it tonight, the latest. And what's the earliest he can do it tomorrow."  HODGES replied, "Aight."

67.     I believe that P. WILLIAMS called HODGES to purchase an ounce of cocaine base ("I'm going to need that whole thing").  I believe that P. WILLIAMS was interested specifically in cocaine base because during a subsequent conversation between HODGES and P. WILLIAMS on that same date, which occurred at 5:46 p.m., HODGES asked P. WILLIAMS if he wanted it "regular" or "done."  P. WILLIAMS responded that he wanted it "done."  I know from my narcotics background that "regular" refers to powdered cocaine, and "done" to cocaine base.  Further, HODGES told P. WILLIAMS that if he wanted it "done," he would not have the request ready until the next day, thereby allowing time to convert (also known as "cooking," "chefing," or "doing it up") powdered cocaine into cocaine base.

68.     That same day (May 23, 2019), at 7:14 p.m., HODGES used Target Telephone 3 to call T. DAYE on Target Telephone 7.  During the conversation, HODGES remarked, "And I think me people needs a whole one, too.  Like last time."  T. DAYE replied, "A whole joint?"  HODGES responded, "Yeah."  T. DAYE replied, "Alright, let me, uh… what the soft one?"  HODGES responded, "Yeah, no, no.  Just have Ave do it up."  T. DAYE responded, "Aight."

69.     Based on this intercepted conversation, I believe that HODGES asked T. DAYE to bring him an ounce of cocaine base for P. WILLIAMS ("I think me people needs a whole one, too").  I know from my narcotics experience that "a whole one" refers to an ounce of cocaine.  T. DAYE then asked if HODGES wanted it "soft," referring to powdered cocaine, to which HODGES told him "no…no, just have Ave do it up." I know that "do it up" means converting cocaine to

cocaine base.  I also recognize "Ave" as the nickname for A.W., one of HODGES's drug runners within Fidelis Way.

70.     On May 24, 2019, at 12:58 p.m., HODGES received a text message on Target Telephone 3 from P. WILLIAMS on telephone number (857) 249-6298.  P. WILLIAMS said, "Yo, wuts the word."  HODGES replied at 1:11 p.m., "He coming now."  A minute later, P. WILLIAMS texted, "Word u n hood."  HODGES responded back at 1:13 p.m., "Yup."  P. WILLIAMS replied a minute later, "ok I'll b out that way wit n hr."  Based on the text communication, as well as the prior communications between HODGES and P. WILLIAMS on May 23, 2019, I believe that P. WILLIAMS contacted HODGES to determine when HODGES would be obtaining P. WILLIAMS's requested ounce of cocaine base.

71.     Minutes later, at 1:09 p.m. – while HODGES was in the midst of texting P. WILLIAMS (see preceding paragraph) – HODGES used Target Telephone 3 to call T. DAYE on Target Telephone 7.  HODGES said, "I'm over here now, I was just laying down.  I'm already, I'm at ah Sito's. You ready to bring it up?"  T. DAYE replied, "Um… yeah. What you want, that other one?"  HODGES replied, "Yeah, dude want one, let me just text him."  Based on the call's substance, as well as my knowledge of HODGES's then in-process text communications with P. WILLIAMS, I believe that HODGES was following up on his prior night's order to T. DAYE for an ounce of cocaine base for P. WILLIAMS.  Additionally, I know that "Sito" is the nickname for HERNANDEZ who resides at 34 Fidelis Way, Apartment 568.

72.     On May 24, 2019, at 2:04 p.m., HODGES received a call on Target Telephone 3 from T. DAYE on Target Telephone 7.  T. DAYE said, "Yo, I'm outside."  HODGES replied, "Aight, come upstairs.  Yeah, cause I'll meet you in the hallway upstairs, Sito and his girl is asleep."  T. DAYE said, "Ok, ah, sixth, sixth floor?"  HODGES responded, "Sixth floor, yeah, I'm

buzz it." T. DAYE said, "Aight, I'm about to come to the door now." I believe that T. DAYE informed HODGES of his arrival at 34 Fidelis Way (HERNANDEZ's residence) to deliver cocaine base to HODGES.

73.   That same day (May 24, 2019), as the above call was occurring, surveillance saw T. DAYE arrive in the black Toyota Camry, Massachusetts registration 55W150 (the "black Camry"), and park in front of 34 Fidelis Way at 1:05 p.m.  Surveillance then watched T. DAYE, whom they identified based on a review of his driver's license photograph, enter 34 Fidelis Way. At 1:09 p.m. – minutes after his arrival – surveillance observed T. DAYE exit 34 Fidelis Way and leave the area in his black Camry.  From my narcotics training and experience, I believe that T. DAYE's brief visit at a known stash location was consistent with him delivering drugs.  I am also aware that approximately four minutes is sufficient time to travel from the entrance to the sixth floor and back.

74.   Also that same day (May 24, 2019), at 2:09 p.m., HODGES used Target Telephone 3 to call P. WILLIAMS on telephone number (857) 249-6298.  HODGES said, "Yo! He brought it, but I don't got not calculator there, but he said it was straight.  I don't know if you want it…" P. WILLIAMS responded, "I got a calculator and everything with me."  HODGES replied, "Aight, aight. We straight then, aight."  P. WILLIAMS responded, "Where you at?" HODGES replied, "I'm at Sito's."  P. WILLIAMS responded, "Alright, I'll be right over there."  HODGES replied, "Aight."

75.   I believe that HODGES called P. WILLIAMS to confirm that he had received the drugs for P. WILLIAMS from his supplier.  Further, based on HODGES's calls with T. DAYE that same day, as well as corroborating surveillance of T. DAYE's arrival at 34 Fidelis Way, I believe that T. DAYE was that supplier.  Also, from my narcotics experience, I know that

HODGES and P. WILLIAMS's discussion about a "calculator" referred to a digital scale with which to weigh the narcotics.  Lastly, I know that HODGES's reference to "Sito's" was to HERNANDEZ's apartment at the Fidelis Way apartment complex.

76.     At 2:09 p.m., i.e., moments after the preceding call, in which P. WILLIAMS said that he would be right there, surveillance observed P. WILLIAMS arrive at 34 Fidelis Way wearing a backpack, carrying a white paper bag in his hand, and entering the building complex. P. WILLIAMS was identified from a review of his driver's license photographs as well as surveillance photographs of him entering and exiting the building.  At 2:19 p.m., surveillance saw P. WILLIAMS exit the building and leave the area.  Based on P. WILLIAMS's prior calls with HODGES, coupled with his brief visit to 34 Fidelis Way, which is the building containing HERNANDEZ's apartment, which is where HODGES said he was, I believe that P. WILLIAMS met with HODGES to obtain one ounce of cocaine base.  Moreover, based on my narcotics training and experience, I am aware that approximately ten minutes is sufficient time to travel from the entrance to HERNANDEZ's apartment and back and to weigh a quantity of drugs on a digital scale, which P. WILLIAMS said that he had in the preceding call.

G. **MATTHEW DRAYTON and JEAN AMAN**

1. **AMAN Supplies Drugs to M. DRAYTON**

77.     On June 30, 2019, at 6:03 p.m., M. DRAYTON received a telephone call on Target Telephone 1 from AMAN on telephone number (617) 959-3920.[9]  AMAN said, "Ain't shit, coolin,

---

[9] On August 19, 2019, officers arrested Jean AMAN for possession of approximately 62 grams of cocaine.  At the time of his arrest, officers dialed telephone number (617) 959-3920, and a telephone seized during AMAN's arrest began to ring.  Additionally, investigators intercepted (617) 959-3920 on other occasions communicating with M. DRAYTON, and after those calls, surveillance observed M. DRAYTON and AMAN meeting.

just umm Spank hit me earlier, give me your number to hit you."  M. DRAYTON responded,

"Okay. Yeah what up fam?"  AMAN replied, "Ain't shit Brody.  I had ummm, finished putting

that together to see umm, would you be riding or where you was trying to meet or what you was

trying to do."  M. DRAYTON responded, "I'm bout to get, I'm bout to be up with a ride in a little

so."  AMAN said, "Alright, so when you are driving just call me so we can get something up."  M.

DRAYTON later asked, "Wait, where do you want me towards, too?"  AMAN answered, "I'll be

around like, like ah, like Brigham anyways so."  M. DRAYTON replied, "Okay, alright.  That's

the way I gotta go.  I'm going to Brighton anyways so."  AMAN said, "Oh, bet, alright.  So, it's

on the way.  I'm like, fuckin down the street by like Fenway, it's like close to that area."  M.

DRAYTON replied, "Word, word."  AMAN said, "(u/i) when you move."  M. DRAYTON

commented, "So I'm lock this number in right here fam."  AMAN said, "Yeah, yup.  You can do

that."  M. DRAYTON responded, "Aight."  From my work on this case, I know that AMAN's

reference to "Brigham" is to Brigham Circle, which would be located on M. DRAYTON's way to

Brighton.

78.     Based on the intercepted call and my work on this investigation, I believe that

AMAN contacted M. DRAYTON because "Spank" instructed AMAN to sell M. DRAYTON

drugs.  AMAN confirmed that he had prepared the drugs for M. DRAYTON's purchase ("I had

umm, finished putting that together so see ummm…"), which I also believe was a reference to

AMAN having converted cocaine into cocaine base.  I also believe that they intended to meet in

Brighton, where much of M. DRAYTON's dealing took place.

79.     Less than a half hour later that same day, at 6:27 p.m., M. DRAYTON used Target

Telephone 1 to call AMAN on telephone number (617) 959-3920.  During the call, M. DRAYTON

said, "It ain't shit.  I'm leaving over from (u/i) right now.  So, I'll be down there in like three

minutes."   AMAN responded, "Alright.   Aight, I'mma text you the address, right?"   M. DRAYTON responded "Alright."   Based on the call, I believe that M. DRAYTON and AMAN were coordinating a meeting location for purposes of their drug deal.

80.   Minutes later, at 6:31 p.m., M. DRAYTON received a text message on Target Telephone 1 from AMAN.   The text message read, "20 Park Dr. Boston ma." Based on the prior call between AMAN and M. DRAYTON, I believe that the address was the location where M. DRAYTON was going to meet AMAN.   Further, a review of that address shows that it is in close proximity to AMAN's identified residence at 39 Peterborough Street, which investigators confirmed through surveillance of one of M. DRAYTON's and AMAN's meetings that occurred near 39 Peterborough Street.   Surveillance subsequently saw AMAN enter 39 Peterborough Street. From my training and experience, I know that it is common for drug dealers to send an address near their address, so as to facilitate the deal while avoiding law enforcement detention or potential robberies.   Surveillance units followed M. DRAYTON as he left his residence at 117 Moreland Street and entered a gray Dodge Caravan with New Hampshire registration 4096252 (the "gray Caravan"), which ultimately drove to parked at a Shell Gas Station located at 1241 Boylston Street, Boston, Massachusetts.

81.   At 6:41 p.m., M. DRAYTON used Target Telephone 1 to call AMAN on telephone number (617) 959-3920.   During the conversation, M. DRAYTON said, "Yeah, I'm at the gas station now."   AMAN said, "You say by the gas station? Which one, at the Shell?  Or Sunoco?" M. DRAYTON responded, "Shell, I'm at the Shell." AMAN responded, "Shell?  Alright.  I'm about to be outside right now.  I'mma call you right back."   M. DRAYTON responded, "Alright."

82.   Approximately five minutes later, at 6:46 p.m., M. DRAYTON received a telephone call on Target Telephone 1 from AMAN using (617) 959-3920.  AMAN said, "Yo. You

are at the gas station, right?"  M. DRAYTON confirmed, "Yeah, I'm at the gas station."  AMAN

instructed, "You have to take a right to be on Park Drive, and then you stay there." M. DRAYTON

said, "I'mma walk over, cause, I'm in the car with some people, I don't want niggas…"  AMAN

responded, "Oh! Okay, okay!  I didn't even know that.  Damn, my bad!  I would have pulled up

in the whip.  I was over here walking, too."  M. DRAYTON explained, "Yeah, that's why I told

them to park in the gas station."  AMAN said, "Okay, Okay.  Aight, fuck it, I'll just bust a lap or

something."  M. DRAYTON responded, "Yeah, I'm about to just walk, I'mma walk over that way

though."  AMAN said, "I'll just walk to the right right here.  Just come over to Park Drive, I'mma

walk in that direction."  Based on the intercepted call, I believe that M. DRAYTON told AMAN

he would walk to AMAN to purchase the drugs because he was then in a car with others and did

not want them to see ("I'mma walk over, cause, I'm in the car with some people, I don't want

niggas…").  After some back and forth about the logistics of meeting up on foot, in which AMAN

apologized for not having coordinated their meetup better ("I didn't even know that. Damn, my

bad! I would have pulled up in the whip"), M. DRAYTON and AMAN agreed to meet in the Park

Drive area while approaching one another on foot.

83.    At that same time, surveillance observed M. DRAYTON walk from the Shell Gas

Station located at 1241 Boylston Street to Park Drive where he met with a black male wearing a

gray hooded sweatshirt with the hood pulled over his head.  Although agents could not clearly see

that individual's face due to the hooded sweatshirt, I believe the individual was AMAN based on

the corroborating intercepted calls.  Surveillance then watched M. DRAYTON and AMAN walk

together for a short period of time before they separated.  Surveillance then saw the hooded man

(believed to be AMAN) enter into an alleyway behind 39 Peterborough Street.  Based on the

telephone calls and surveillance of the two walking together for enough time for an exchange, I

believe that M. DRAYTON and AMAN did a drug deal for an unspecified quantity of cocaine base.

### 2.  __AMAN and M. DRAYTON Attempt Another Drug Deal__

84.     On August 19, 2019, at 6:32 p.m., M. DRAYTON used Target Telephone 1 to text AMAN on telephone number (617) 959-3920.  The text message said, "Need to get with you when you get a chance I'm at the crib."  At 6:38 p.m., AMAN replied, "Aite cool. I need a couple hrs."  At 6:39 p.m., M. DRAYTON replied, "Good looking I will be here."

85.     After the above intercepted conversation, surveillance units set up in the area of AMAN's residence, 39 Peterborough Street, in an attempt to observe AMAN and M. DRAYTON's meetup.  That same date, at 7:00 p.m., surveillance observed AMAN.  Specifically, surveillance initially saw AMAN in the area of Jersey Street, Boston, approach an unidentified Hispanic male who was wearing a white T-shirt, black shorts, and a red baseball hat.  The Hispanic male stood next to a small white sedan with Massachusetts registration 1SMR45 and spoke on a cellphone.  AMAN and the male entered the car (with AMAN entering the passenger side) at 7:04 p.m.  A minute later, AMAN exited the vehicle and walked towards Queensbury Street along Park Drive.  The unidentified Hispanic male left the area.  At the time of the car's departure, surveillance saw another unidentified individual inside the car.  Based on my narcotics training and experience, the short vehicle visit, and AMAN's prior statement indicating he would "need a couple hrs," I believe that AMAN did a drug deal in the car.

86.     Surveillance continued to follow AMAN as he walked.  Minutes later, at 7:09 p.m., surveillance saw him enter the passenger side of a black 2015 Jeep Grand Cherokee with Massachusetts registration 6240LA (the "black Jeep"). The black Jeep drove AMAN back to his identified residence at 39 Peterborough Street and parked in the rear alley.

87.     That evening, at 9:07 p.m., AMAN (on telephone number (617) 959-3920) called M. DRAYTON (on Target Telephone 1).  AMAN said, "Yeah, Brody, yeah I'm about to be over there, it will be probably fifteen to twenty minutes, I'm just waiting for my cousin to pull up with my car."  M. DRAYTON responded, "Alright, I'll be here."  AMAN added, "He about to be here in a second."  M. DRAYTON said, "Alright, I'll be here."  AMAN replied, "Alright cool."  From the conversation, I believe that AMAN was about to leave his residence to meet up with M. DRAYTON at 117 Moreland Street for purposes of supplying the drugs previously requested by M. DRAYTON, which I believe that AMAN had acquired two hours earlier.

88.     After the above call, at 9:32 p.m., surveillance saw AMAN appear in the rear alley behind 39 Peterborough Street carrying a green bag.  Around that same time, surveillance saw a black 2014 Dodge with Massachusetts registration 9MN914, registered to AMAN at 45C Memorial Road Apartment 17 in Somerville, Massachusetts (the "black Dodge"), leave the alley. Investigators have observed that same black Dodge at 39 Peterborough Street on multiple occasions during the course of this investigation.  Surveillance saw AMAN seated in the car's front passenger seat.  Law enforcement continued following AMAN in the black Dodge and subsequently stopped the car on Longwood Avenue at Avenue Louis Pasteur in Boston, Massachusetts.  During the traffic stop, officers recovered approximately 62 grams of cocaine from the rear waist area of AMAN's pants and arrested him.

89.     After the motor vehicle stop, investigators went to 39 Peterborough Street, Apartment 14, Boston, Massachusetts.  AMAN's girlfriend initially authorized the officers' entry into the apartment and consented (in writing) to a search.  After several minutes, she placed an unidentified male on speaker phone who asked the officers to leave.  The girlfriend similarly revoked her consent and asked the officers to leave.  The officers, who had observed two bags of

39

money in the apartment and a scale, left, secured the apartment, and obtained a search warrant that

same night from Brighton District Court.  During their search of the apartment, officers recovered

approximately 600 grams of a substance that field tested positive for cocaine, $195,731, three

firearm magazines, paperwork in AMAN's name, and 167 rounds of assorted ammunition.[10]

### H. KEITH DAYE and TERRENCE DAYE

#### 1. T. DAYE Seeks Cocaine from K. DAYE

90.     On July 16, 2019, at 6:49 p.m., T. DAYE received a call on Target Telephone 7

from K. DAYE on Target Telephone 10.[11]  T. DAYE asked, "You still fucking with the old girl?"

K. DAYE answered, "Which one?"  T. DAYE said, "The white one."  K. DAYE replied, "Yeah,

yeah, yeah."  T. DAYE responded, "I'm trying to see what's up 'cause my people wanted some,

but I don't know at what time they are gonna come down."  K. DAYE said, "What they want?"

T. DAYE responded, "Shit, probably like a zip."  K. DAYE replied, "Alright."  T. DAYE asked,

"What, what, what would be your number on that?"  K. DAYE said, "Thirteen dollars."  T. DAYE

replied, "Thirteen, got it, got it.  Bet, bet.  So let me just let them know."  K. DAYE replied, "Call

me right back so I know to bring it."

91.     Based on my training, experience, and the call's context, I believe that K. DAYE

confirmed for T. DAYE that he was still selling cocaine after T. DAYE asked whether he was

"still fucking with the old girl . . . the white one," to which K. DAYE responded, "yeah, yeah,

yeah."  I know that both "girl" and "white" are common drug terms for cocaine.  Additionally, I

know that "zip" is drug code for an ounce.  From the call, I believe that T. DAYE asked to purchase

---

[10] AMAN currently has pending state charges for Trafficking Class B (cocaine).

[11] Investigators believe that T. DAYE and K. DAYE are cousins.

40

an ounce of cocaine from K. DAYE, who confirmed the price as "thirteen dollars," meaning $1,300, which is consistent with street pricing for cocaine in the Greater Boston area, and that T. DAYE wanted the drugs in turn for his regular customers (his "people").

## 2. K. DAYE Supplies Cocaine to G.R.[12]

92.     On February 21, 2020, at 8:44 p.m., K. DAYE used Target Telephone 18 to contact G.R. on telephone number (857) 236-4438.  K. DAYE said, "10-5."  G.R. asked, "10-5?"  K. DAYE said, "Yeah."  G.R. replied, "That's (u/i) huh?"  K. DAYE said, "Huh? That's a nina."  G.R. replied, "Yo, a 10-5."  K. DAYE confirmed, "Yeah."  G.R. said, "Aight, so… (u/i)" K. DAYE responded, "10,500."  G.R. remarked, "Whoa, shit Keith.  I'll take, how much is the um… a forty?  I mean a four play."  K. DAYE answered, "Half of that."  G.R. asked, "Aight, so when can you do it?  Tomorrow?"  K. DAYE said, "Tomorrow."  G.R. stated, "I'll call you."  K. DAYE replied, "Are you sure? I don't want to order it, you know what I mean?" G.R. said, "Yeah, but that's a lot of money dog. Goddamn, I was getting it for 47."  K. DAYE replied, "Hold on, hold on."  G.R. said, "Forty-seven for a four play."  K. DAYE ultimately told G.R. that he would call him back, but there was no return call that day on either of K. DAYE's phones (Target Telephone 10 or Target Telephone 18).

93.     Based on the call's substance, as well as my training, experience, and work on this investigation, I believe that G.R. called K. DAYE to order nine ounces of cocaine ("nina"), which K. DAYE priced at $10,500 ("10-5").  G.R. was shocked at K. DAYE's proposed price and then asked for pricing on 125 grams of cocaine ("four play").  From training, experience, and my work on this investigation, I know that a "four play" or "four way" refers to 125 grams of cocaine, which

---

[12] G.R.'s criminal charge of Trafficking Class B is pending in state court.

would amount to half of nine ounces ("nina") and roughly double 62 grams ("doob").  I know that "four play" or "four way" refers to 125 grams of cocaine, as opposed to four ounces, for the following reasons.  Were a kilogram of cocaine divided into pieces, half a kilogram would amount to 500 grams, half of that amount would be 250 grams ("nina," or nine ounces"), half of that would be 125 grams ("four play" or 4.5 ounces), and half of that amount would equate to 62 grams ("doob").  K. DAYE indicated it would cost half of $10,500 ("half of that").  G.R. agreed to that deal, but noted that he used to purchase 125 grams for $4,700 ("Goddamn, I was getting it for 47").  Based on my narcotics experience in this and other investigations, I believe that the price of cocaine was going up because of the coronavirus pandemic, which had already begun to reduce the supply of cocaine from Mexico to California.

94.    On February 23, 2020, at 6:40 p.m., K. DAYE on Target Telephone 18 called G.R. on telephone number (957) 236-4438.  G.R. said, "Tried to holla at you yesterday, the other day, I had my son all day the other day that's why I cancelled on you."  K. DAYE responded, "Oh, I thought you should've, yeah yesterday my man my stepson's birthday so I wasn't doing nothing. So are you good?"  G.R. said, "Nah, nah I wanna see ya um… then on top of that my umm, when I get my taxes, my whole shit didn't go in so I was gonna see if I could get the ummm… just one of them niggas."  K. DAYE responded, "Aight, aight cool. Tomorrow morning early."  G.R. asked, "Yeah, that's five, right?" K. DAYE confirmed, "Yes."  G.R. said, "Alright so umm, call me when you get up."  I believe that G.R. again ordered 125 grams of cocaine from K. DAYE when he asked for "one of them niggas."  G.R. also confirmed the price as "five," meaning $5,000, which I know to be consistent with current street pricing for such a quantity of cocaine.  Additionally, from G.R. and K. DAYE's prior call on February 21, 2020, where G.R. also ordered 125 grams of cocaine, I know that K. DAYE charged G.R. "half" of $10,500, which is just over $5,000.

95.     On February 24, 2020, at 1:10 p.m., K. DAYE used Target Telephone 18 to call G.R. on telephone number (857) 236-4438. K. DAYE asked G.R., "Yo, what time you coming around?" G.R. said, "Uh, what we going to do? The same thing?" K. DAYE uttered, "Uh?" G.R. asked, "As last time? The food place?" K. DAYE replied, "Yeah, yeah, yeah." G.R. responded, "Okay, um, I will be that way in like what… 2:30?" K. DAYE said, "Aight, that's cool." Based on this telephone call, I believe that G.R. and K. DAYE were going to meet about 2:30 p.m. that day to do a drug deal. Accordingly, agents conducted surveillance on K. DAYE.

96.     That same day, at 2:20 p.m., K. DAYE used Target Telephone 18 to call G.R. on telephone number (857) 236-4438. K. DAYE asked, "How long, fool?" G.R. responded, "I'm about to jump on the road now." K. DAYE said, "Aight, cool, cool, cool." G.R. stated, "I'll call you as soon as I get close to you, alright?" K. DAYE responded, "Alright, got you."

97.     About an hour later, at 3:12 p.m., G.R. (on (857) 236-4438) called K. DAYE (on Target Telephone 18). K. DAYE said, "I'll be there." G.R. replied, "Aight." K. DAYE said, "Aight." At 3:30 p.m., surveillance saw K. DAYE arrive at Frank's Restaurant (located at 265 North Pearl Street, Brockton, MA) driving a white 2019 Ford F-250 with Massachusetts registration 1TLK41,registered to K. DAYE (the "white F-250"). K. DAYE exited the white F-250 and walked down the side of the restaurant with a black male whom agents subsequently identified as G.R. based on a review of his driver's license photograph. K. DAYE and G.R. entered a blue 2007 Honda Accord with Massachusetts registration 9ZB391 (registered to E.R.) (the "blue Accord"), which was previously parked at the restaurant. After being in the blue Accord for approximately twenty seconds, K. DAYE exited the car and went back to his white F-250. Both vehicles left the area, and surveillance followed the blue Accord. Based on the calls, the

observations of K. DAYE and G.R.'s brief meeting, and my experience in drug investigations, I believe that K. DAYE and G.R. had done a drug deal.

98.     Surveillance followed the blue Acord without stopping or losing sight until it reached Taunton, Massachusetts.  At 3:56 p.m., the blue Accord pulled to the side of the road in front of 157 School Street, Taunton, Massachusetts.  Surveillance approached G.R.  During their encounter, officers recovered 125 grams of a white powder, rock-like substance from inside the blue Accord.  Agents believed the substance, which is pending state lab testing, was cocaine based on their training and experience.  Officers also called phone number (857) 236-4438 – which had been in communication with K. DAYE – and a cellular telephone on G.R.'s person rang.

## IV.    CONCLUSION

99.     Based on the foregoing, there is probable cause to believe the Target Subjects conspired to distribute and to possess with intent to distribute cocaine and cocaine base, in violation of Title 21, United States Code, Section 846.  In light of the evidence summarized above, I respectfully request that the Court issue the requested criminal complaint.

Signed under the pains and penalties of perjury this 23rd day of June 2020.



James A. Peters
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me by telephone this 23rd day of June 2020.

HON. MARIANNE B. BOWLER
United States Magistrate Judge